UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Nickcole S. Varney</u>

    v.                                          Case No. 10-cv-369-PB

<u>Michael J. Astrue, Commissioner,</u>
<u>Social Security Administration</u>

**REPORT AND RECOMMENDATION**

    Pursuant to 42 U.S.C. § 405(g), Nickole Varney moves to reverse the Commissioner's decision denying her application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382. The Commissioner, in turn, moves for an order affirming his decision. For the reasons that follow, I recommend that this matter be remanded to the Administrative Law Judge ("ALJ") for further proceedings consistent with this report and recommendation.

**Standard of Review**

    The applicable standard of review in this case provides, in pertinent part:

        The [district] court shall have power to enter, upon
        the pleadings and transcript of the record, a judgment

> affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB decisions); see also 42 U.S.C. § 1383(c)(3) (establishing § 405(g) as the standard of review for SSI decisions). However, the court "must uphold a denial of social security . . . benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts." Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)). In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). But, "[i]t is the responsibility of the [Commissioner]

2

to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts." <u>Irlanda Ortiz v. Sec'y of HHS</u>, 955 F.2d 765, 769 (1st Cir 1991) (citations omitted).  Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  <u>Tsarelka v. Sec'y of HHS</u>, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  <u>Irlanda Ortiz</u>, 955 F.2d at 769 (quoting <u>Rodriguez v. Sec'y of HHS</u>, 647 F.2d 218, 222 (1st Cir. 1981)).

**Background**

The parties have submitted a Joint Statement of Material Facts, doc. no. 13.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

Until March of 2003, Varney worked as a cashier in various retail establishments.  Other than one or more unsuccessful work attempts, she has not engaged in substantial gainful activity since then.

3

In September of 1997, after she had unexpectedly lost consciousness several times over the course of the previous year, including one episode at work, Varney was seen by Dr. Parker Towle.  Varney told Dr. Towle that in association with her blackouts, she suffered chest pain and confusion.  Administrative Transcript (hereinafter "Tr.") 221.  Dr. Towle administered "a tilt tablet test which disclosed neurocardiogenic syncope."[1]  Id. at 221.  In about 1999, Varney began taking Atenolol,[2] which effectively controlled her fainting spells.  Varney sought treatment for chest pain and lightheadedness in 2002.  Between August and November of 2004, she went to the doctor approximately five times complaining of various neurocardiogenic syncope symptoms including blackouts, dizziness, and blurred vision.  She was treated first with Atenolol and then with Pindolol.[3]

In June of 2006, Dr. Joseph Cataldo completed a Physical Residual Functional Capacity Assessment.  He determined that Varney had the capacity to perform light work, Tr. 189, with

---

[1] Syncope is a "[l]oss of consciousness and postural tone caused by diminished cerebral blood flow."  Steadman's Medical Dictionary 1745 (27th ed. 2000).

[2] Atenolol is "[a] relatively cardioselective β-adrenergic blocking agent used primarily in the treatment of angina pectoris and hypertension."  Id. at 162.

[3] Pindolol is "[a] β-adrenergic blocking agent used in the treatment of hypertension."  Id. at 1384.

4

certain postural limitations, Tr. 190, and a limitation against even moderate exposure to hazards (machinery, heights, etc.), Tr. 192. At the conclusion of his assessment, Dr. Cataldo offered the following relevant additional comments:

> 26 YR. OLD FEMALE WITH AOD OF 3-31-03 DUE TO 'NEUROCARDIOGENIC SYNCOPE AND BURSITIS'
>
> . . . .
>
> HAS HAD HER OCCASIONAL EPISODES OF SYNCOPE SINCE AGE 16.  TILT-TABLE EXAM. WAS POSITIVE FOR NEUROCARDIOGENIC SYNCOPE.  B-BLOCKERS HAVE BEEN VERY EFFECTIVE IN TREATING THIS.  FROM AOD TO SEPT. '04 NO MER.  IN SEPT. '04 HAD ECHO. AND STRESS TEST WHICH WERE NORMAL.  EF WAS 65%
>
> . . . .
>
> ADL'S ARE FULL, WITH ABILITY TO CARE FOR 2 SMALL CHILDREN.  DID NO DRIVING.

Tr. 195.

In September of 2006, Varney was examined by a consultative psychologist, Dr. Maura Sullivan. Varney reported a variety of symptoms resulting from her neurocardiogenic syncope including anxiety, stress, and memory problems. Tr. 198. Dr. Sullivan administered a battery of tests including several devoted to assessing Varney's memory. Dr. Sullivan's testing yielded the following results:

> Her working memory score falls in the middle of the Average range.
>
> . . . .

> The Wechsler-Memory Scale-3rd edition provides an assessment of immediate, delayed, and working memory in the auditory and visual modality.
>
> . . . .
>
> [Varney's] scores are representative of intact general memory that falls at the lower end of the High Average range. Visual Memory appears to fall in the average range with a preference for auditory memory falling in the superior range for immediate memory and upper end of the high average range for delayed memory. Overall immediate memory is stronger than visual memory immediate and delayed. The Letter Number Sequencing Score of 8 obtained on the WAIS-III indicates a relative weakness with working memory increasing as the task increases in difficulty (DS = 10).

Tr. 199-200. Finally, Dr. Sullivan gave the following opinion, among others, on Varney's then current level of functioning: "Mrs Varney's performance during testing indicates that she is able to understand and remember instructions. She reports inability to do so on 'bad days' following 'black outs'." Tr. 201. In describing another area of functioning in which Varney also claimed difficulties on so-called bad days, Dr. Sullivan noted: "[Varney] reports that stress can induce an 'episode'. She was able to tolerate testing without an apparent 'episode'; however, this examiner can't generalize results to 'bad days'." Id.

Shortly after Dr. Sullivan produced her report, agency consultant Dr. Edward Martin completed both a Psychiatric Review Technique form and a Mental Residual Functional Capacity

Assessment.  In the latter, Dr. Martin identified no mental limitations.  Tr. 203-06.  More specifically, he found that Varney was not significantly limited in any of eleven abilities listed under the categories of "understanding and memory" and "sustained concentration and persistence."  Tr. 203-04.  Under the category of "understanding and memory," Dr. Martin found that Varney was not limited in: (1) "[t]he ability to remember locations and work-like procedures;" (2) "[t]he ability to understand and remember very short and simple instructions;" or (3) "[t]he ability to understand and remember detailed instructions."  Tr. 203.

The ALJ conducted a hearing at which he took testimony from both Varney and her husband.  Among other things, they testified that: (1) Varney is taking medication for her syncope; (2) even so, she has three or four episodes of altered consciousness per month, if not more; (3) episodes can be triggered by stress; (4) doing things outside her home causes Varney stress and anxiety; (5) her episodes can include blackouts, extended periods of mental confusion and a range of other symptoms; and (6) she suffers from a memory deficit as a symptom of her syncope.

With regard to the nature and extent of Varney's episodes of altered consciousness, her husband offered the following description:

7

> Q  So do these episodes vary in intensity and length?
>
> A  Yeah.  Sometimes the disorientation is a lot worse than others where her speech will start slurring, and she starts – it affects her equilibrium.  She can't stand upright.  Other times, you know, it's just she repeats herself, and she has the glazed-over eyes but – and then sometimes it gets more intense and she actually does black out.
>
> Q  And how long do these – how long is she affected by these?  If she has an episode, how long do you expect it to last?
>
> A  Depending on the severity they could last anywhere from a few hours to a few days at a time where she's not right, where she's having the disorientation.

Tr. 32-33.

With regard to her memory problems, Varney and her husband described specific things that Varney can no longer remember, such as her high school graduation, her wedding, and the birth of her first child.  They also described: (1) manifestations of Varney's memory loss (she will take several showers a day, having forgotten that she had already showered); (2) limitations Varney observes at home on account of her memory loss (she does not use the stovetop, because she fears forgetting to turn it off); and (3) accommodations she has learned to make (listing daily activities, such as brushing her teeth, and scratching them off the list once she has completed them).  A letter from Varney's mother submitted to the ALJ after the hearing was to similar effect.  Tr. 126.

After the hearing, the ALJ issued a decision that includes the following findings of fact and conclusions of law:

> 3. The claimant has the following severe impairment: neurocardiogenic syncope (20 CFR 404.1527(c) and 416.920(c)).
>
> . . . .
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> . . . .
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the need to avoid exposure to heights and to dangerous machinery.
>
> . . . .
>
> 6. The claimant is capable of performing past relevant work as a cashier.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

Tr. 12, 13, 15.  In the context of determining Varney's residual functional capacity ("RFC"), the ALJ determined that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not credible to the extent they are inconsistent with [his] residual functional capacity assessment."  Tr. 14.

**Discussion**

According to Varney, the ALJ's decision should be reversed, and the case remanded, because the ALJ: (1) failed to discuss her ability to perform sustained work activities on a regular and continuing basis; (2) made an inadequate finding on credibility; (3) failed to consider certain evidence entered into the record by her mother; and (4) failed to develop the medical record by ordering a consultative examination.  The Commissioner disagrees, categorically.

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The question in this case is whether Varney was disabled.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3)(A)

(setting out a similar definition of disability for determining eligibility for SSI benefits). Moreover,

> [a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work. . . .

42 U.S.C. § 423(d)(2)(A) (pertaining to DIB benefits); see also 42 U.S.C. § 1382c(a)(3)(B) (setting out a similar standard for determining eligibility for SSI benefits).

In order to determine whether a claimant is disabled for the purpose of determining eligibility for either DIB or SSI benefits, an ALJ is required to employ a five-step process. See 20 C.F.R. §§ 404.1520 (DIB) and 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920).

The claimant bears the burden of proving that she is disabled. See Bowen v. Yuckert, 482 U.S. 137, 146 (1987). She must do so by a preponderance of the evidence. See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)). Finally,

> [i]n assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) plaintiff's subjective claims of pain and disability as supported by the testimony of the plaintiff or other witness; and (3) the plaintiff's educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

Among Varney's arguments for reversal are assertions that the ALJ made an inadequate credibility determination and that he failed to consider the impact of her impairment on her ability to regularly perform work activities. Taken in combination, those arguments are meritorious and dispositive.

According to Social Security Ruling ("SSR") 96-7p, "an individual's statement(s) about his or her symptoms[4] is not in

---

[4] "A symptom is an individual's own description of his or her physical or mental impairment(s)." SSR 96-7p, 1996 WL 374186, at *2.

12

itself enough to establish the existence of a physical or mental impairment or that the individual is disabled," 1996 WL 374186, at *2.  When "symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness," id., are alleged, SSR 96-7p prescribes a two-step evaluation process:

> * First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to produce the individual's pain or other symptoms. . . .  If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.
>
> * Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

Id.  In addition:

> When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available

>information that could shed light on the credibility
>of the individual's statements.  In recognition of the
>fact that an individual's symptoms can sometimes
>suggest a greater level of severity of impairment than
>can be shown by the objective medical evidence alone,
>20 CFR 404.1529(c) and 416.929(c) describe the kinds
>of evidence, including the factors below, that the
>adjudicator must consider in addition to the objective
>medical evidence when assessing the credibility of an
>individual's statements:
>
>>1. The individual's daily activities;
>>
>>2. The location, duration, frequency, and
>>intensity of the individual's pain or other
>>symptoms;
>>
>>3. Factors that precipitate and aggravate the
>>symptoms;
>>
>>4. The type, dosage, effectiveness, and side
>>effects of any medication the individual takes or
>>has taken to alleviate pain or other symptoms;
>>
>>5. Treatment, other than medication, the
>>individual receives or has received for relief of
>>pain or other symptoms;
>>
>>6. Any measures other than treatment the
>>individual uses or has used to relieve pain or
>>other symptoms (e.g., lying flat on his or her
>>back, standing for 15 to 20 minutes every hour,
>>or sleeping on a board); and
>>
>>7. Any other factors concerning the individual's
>>functional limitations and restrictions due to
>>pain or other symptoms.

Id. at *3.

SSR 96-7p outlines a specific staged inquiry that consists of the following questions, in the following order: (1) does the claimant have an underlying impairment that could produce the

symptoms he or she claims?; (2) if so, are the claimant's statements about his or her symptoms substantiated by objective medical evidence?; and (3) if not, are the claimant's statements about those symptoms credible?

Here, the ALJ determined that Varney's "medically determinable impairment could reasonably be expected to produce the alleged symptoms." Tr. 14. But, he found Varney's statements about her symptoms to be not credible, and explained that finding in the following way:

> In terms of the claimant's alleged memory loss for childhood events and ongoing memory difficulties, the undersigned notes that testing by consultative psychologist Dr. Sullivan failed to indicate any significant problems with memory (Exhibit 7F). Also, no treating or examining physician has observed such signs and the claimant has not sought any mental health treatment despite her assertion that she has been unable to work for many years. The claimant does remain quite active. She is able to care for her two children, perform personal care, do light cleaning, laundry, daily walks, sewing and grocery shopping. She spends time with others talking and playing games. She takes walks on a daily basis by self-report at Exhibit 4E. She has not presented any evidence of recent medical treatment despite the fact that the record has been left open for more than 4 months since her hearing. No treating or examining physician has ever indicated that the claimant has a condition which is disabling within the meaning of the Social Security Act.

Tr. 14.

As a preliminary matter, it is important to bear in mind that in this case, Varney identified <u>two</u> separate and distinct symptoms of her impairment, one mental, the other physiological:

> ALJ:  So the question is why can't she work as a cashier then, Mr. Lamb.
>
> ATTY:  Because of the memory problems, Judge.  I mean, we start with the short-term and long-term memory problems.  That's one issue, but <u>more importantly</u> is her inability to attend on a regular basis.  An individual who misses four or more days a month, the vocational experts typically testify is unemployable.

Tr. 37 (emphasis added).  Based on Varney's testimony at the hearing, it is evident that her attorney's reference to missing work days was intended to reflect the number of times each month Varney says she suffers from an altered mental state as a symptom of her syncope.

While Varney plainly claimed to suffer two symptoms of her impairment, memory loss and episodes of altered consciousness, and the ALJ's decision actually mentions Varney's testimony "that she has 3-4 episodes of syncope per month with chest pain, slurred speech and memory loss," Tr. 14, the ALJ's analysis of Varney's symptoms deals <u>only</u> with memory loss, which Varney identified as the less significant of her two symptoms.  Such a reading of the ALJ's discussion of Varney's symptoms is supported by: (1) his express reference to memory loss, and the lack of any mention of altered consciousness; and (2) his

16

references to psychological testing and the absence of mental health treatment, which are relevant to the symptom of memory loss but seemingly not relevant to the physiological symptoms of syncope, i.e., the loss or alteration of consciousness.

The ALJ's decision says nothing about whether there is objective medical evidence to substantiate Varney's claims of chest pain, slurred speech, and altered consciousness. Similarly, the decision cannot fairly be read as including a finding that Varney's statements, as to those symptoms, were not credible. Accordingly, this case must be remanded to the ALJ for a proper consideration of the symptoms Varney claims above and beyond a loss of memory.

On remand, the court would urge the ALJ to consider the following suggestions. First, while it is not entirely clear, a close reading of the ALJ's decision suggests that, perhaps, he may have treated the lack of objective medical evidence as a factor that undermined the credibility of Varney's statements about her symptoms. But, according to SSR 96-7p, the lack of objective medical substantiation is what triggers the need for an ALJ to conduct a credibility finding, not evidence that weighs against a claimant's credibility. The ALJ's possible misapplication of the medical evidence is not particularly consequential in the context of the memory-loss symptom, but may

be more so when the ALJ turns to the symptom he has not yet considered, Varney's asserted episodes of altered consciousness. Second, while it is absolutely the responsibility of the ALJ and not the court to weigh the evidence, see Tsarelka, 842 F.2d at 535, the court would encourage the ALJ to do more than merely acknowledge the fact that Varney's husband offered testimony and actually evaluate that testimony and the degree to which it corroborates Varney's own statements about her symptoms.  Third, given the symptoms at issue in this case, some of which have objective external manifestations, and given the rather strong corroboration of Varney's statements about her symptoms in the record as already developed, the ALJ might be wise to enlist a vocational expert to aid in determining whether a person with the symptoms Varney claims would be capable of performing Varney's past relevant work or any other work.

## Conclusion

For the reasons given, I recommend that: (1) the Commissioner's motion for an order affirming his decision, doc. no. 11, be denied; and (2) Varney's motion to reverse the decision of the commissioner, doc. no. 9, be granted to the extent that the case is remanded to the ALJ for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

Any objection to this Report and Recommendation must be filed within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See Unauth. Pract. of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge

April 26, 2011

cc: Anthony B. Lamb, Esq.
 Robert A. Rabuck, Esq.
 D. Lance Tillinghast, Esq.